537 N.W.2d 624 (1995)
Judith LIPKA as Special Administrator of the Estate of Marianne Bohl, Appellant,
v.
MINNESOTA SCHOOL EMPLOYEES ASSOCIATION, LOCAL 1980, et al., Respondents.
No. C1-95-707.
Court of Appeals of Minnesota.
September 26, 1995.
Review Granted November 13, 1995.
*627 Susan A. McKay, Bemidji, for appellant.
Gregg M. Corwin, Karin E. Peterson, Gregg M. Corwin & Associates, St. Louis Park, for respondents.
Considered and decided by SCHUMACHER, P.J., and PETERSON and THOREEN,[*] JJ.

OPINION
SCHUMACHER, Judge.
Judith Lipka as Special Administrator of the Estate of Marianne Bohl appeals from summary judgment, arguing there were questions of fact that precluded the entry of judgment and that the evidence was impermissibly weighed in favor of respondents Minnesota School Employees Association Service Employees International Union, AFL-CIO, CLC, Local 1980 (MSEA), the Bemidji Chapter Minnesota School Employees Association Service Employees International Union, AFL-CIO, CLC, Local 1980 (MSEA Bemidji), and Kenneth Stevens, in his individual capacity and in his official capacity as President of the Bemidji Chapter of the Minnesota School Employees Association Service Employees International Union, AFL-CIO, CLC, Local 1980 (Stevens). We affirm.

FACTS
Marianne Bohl was hired by Independent School District No. 31 (ISD No. 31) in August or September 1985 as a substitute bus driver. Shortly thereafter, she received a permanent bus route for the transportation of special education children.
Bohl was a member of the MSEA Bemidji union. MSEA Bemidji was affiliated with the state-wide union, MSEA. MSEA in turn was affiliated with or chartered by Service Employees International Union AFL-CIO, CLC (International). MSEA functioned as the exclusive representative of non-supervisory employees.
There was a collective bargaining agreement between MSEA and ISD No. 31. It provided that the transportation coordinator may reduce a driver's hours "within the time spread of the pay level or as mutually agreed" upon by the employer and the employee. Under this agreement, the time spread for Bohl's pay level was six to six and one-half hours.
The relationship between International and MSEA and other locals was governed by a constitution and bylaws (International constitution). The International constitution contained provisions dealing with complaints against officers or other union members. The relationship between MSEA and MSEA Bemidji and other chapters was governed by a MSEA constitution and bylaws (MSEA constitution). The MSEA constitution also contained disciplinary provisions and required the executive director of the union to investigate charges to determine if disciplinary proceedings were warranted. ISD No. 31 also had a personnel manual for its employees, which forbade harassment and violence in the workplace.
*628 Stevens was the elected president of MSEA Bemidji. He set the agenda for and ran the union meetings. ISD No. 31 had Stevens assign the number of children to each of the driver's routes. This affected the length of time it took to complete the route, which in turn affected the drivers' hourly wages.
Bohl and Stevens had a difficult working relationship. Bohl reported to superiors that Stevens drove unsafely. Stevens allegedly told Bohl that she did not have the fortitude to quit smoking; she needed a shave; her hair made her look like a "floozie"; she was a b-tch; and she had purple hair.
Bohl alleged that, in addition to making these verbal insults, Stevens assigned the routes unfairly. From 1986 until 1992, Bohl drove more than eight hours per shift. In the 1992-93 school year, Bohl's hours were cut from eight to six hours. Stevens alleged that other drivers' hours were also cut. After complaining to Stevens, Bohl was given seven and one-half hours.
Bohl also complained of one particular incident involving a meeting for special education drivers conducted on September 8, 1992. Bohl and her aide, Janet Haugen, were walking across the parking lot, when Stevens purportedly drove his bus towards them. They quickly moved out of his way. Stevens was driving so fast that Haugen claimed her hair was pulled back by the wind. Bohl reported the incident to the safety coordinator. After that, Cindy Stevens, Stevens' wife, told Bohl she was "going to kick [her]-ss." Bohl then began receiving hang-up phone calls and had a brick wrapped in children's pants filled with feces thrown at her door.
After trying to work out the conflicts, Bohl decided to take a custodial position within the school district. The union took no part in this transfer. While performing custodial duties, Bohl reinjured a pre-existing injury to her back. She received workers' compensation and did not return to work before her death.
Bohl filed a complaint with the ISD No. 31 about her problems with Stevens. The district investigated the matter and concluded "there wasn't significant evidence produced * * * to substantiate the allegations."
In early October 1992, Bohl expressed her concerns to MSEA and MSEA Bemidji. Chris Schaefer investigated the complaint to determine if ISD No. 31 had violated the collective bargaining agreement. Bohl spoke with Schaefer on a number of occasions during the investigation and taped their conversations. The union concluded that the district had not violated the agreement and thus there was no grievance. In late October 1992, Nancy Crippen, the executive director of MSEA, presented Bohl's complaint to the board. The board took no further action.
On March 15, 1993, Bohl filed a discrimination charge with the Minnesota Department of Human Rights. In April 1993, Bohl sued the MSEA, MSEA Bemidji, and Stevens, claiming assault, gender discrimination, reprisal, intentional and negligent infliction of emotional distress, unfair representation, breach of contract, conspiracy, and tortious interference with contract. MSEA, MSEA Bemidji, and Stevens moved for dismissal pursuant to Minn.R.Civ.P. 12; the motion was denied. A motion was then made for summary judgment. The court granted the motion on all counts, except for assault. Bohl and Stevens moved for reconsideration. The court granted the motion in favor of Stevens and entered summary judgment on the assault claim. On February 2, 1995, Bohl died. Judith Lipka was appointed special administrator and was substituted as plaintiff. Lipka appeals.

ISSUES
1. Which claims, if any, survived Bohl's death?
2. Did the district court err in granting summary judgment on the duty of fair representation claim?
3. Did the district court err in granting summary judgment on the breach of union constitution and bylaws claim?
4. Did the district court err in granting summary judgment on the claims of tortious interference and conspiracy to tortiously interfere with Bohl's contractual rights under the union constitution?
*629 5. Did the district court err in granting summary judgment on the tortious interference with contractual relationship between Bohl and ISD No. 31 claim?
6. Are the tapes of phone conversations and transcriptions thereof a proper part of the record?

ANALYSIS
On appeal from summary judgment, this court decides whether there are any genuine issues of material fact and whether the district court correctly applied the law. State by Cooper v. French, 460 N.W.2d 2, 4 (Minn.1990). The evidence must be viewed "in the light most favorable to the party against whom judgment was granted." Fabio v. Bellomo, 504 N.W.2d 758, 761 (Minn.1993).
1. By notice of review, MSEA, MSEA Bemidji, and Stevens argue that Bohl's claims did not survive her death and thus the district court erred in appointing a special administrator. We conclude that some of Bohl's claims abated.
Under Minnesota law,
A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02. All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.
Minn.Stat. § 573.01 (1994). Minn.Stat. § 573.02, subd. 2 (1994) provides:
When injury is caused to a person by the wrongful act or omission of any person or corporation and the person thereafter dies from a cause unrelated to those injuries, the trustee * * * may maintain an action for special damages arising out of such injury if the decedent might have maintained an action therefor had the decedent lived.
The statute does not define "injury to the person." Whether a claim survives lies "in the substance, not the form, of the cause of action." Beaudry v. State Farm Mut. Auto. Ins. Co., 518 N.W.2d 11, 13 (Minn.1994) (citing Webber v. St. Paul City Ry. Co., 97 F. 140, 145 (8th Cir.1899). The Eighth Circuit found that the test is whether injury to the person or breach of contract is the "primary and moving cause of the damages sought." Webber, 97 F. at 145. This test is consistent with the one presented by the Minnesota Supreme Court in Fowlie v. First Minneapolis Trust Co., 184 Minn. 82, 85, 237 N.W. 846, 847 (1931). Beaudry, 518 N.W.2d at 13. The Fowlie test requires a court to look at "the nature of the damages sued for rather than the form of the remedy." Fowlie, 184 Minn. at 85, 237 N.W. at 847.
Applying these tests to the claims at bar lead to the following results. The claim for breach of contract survived Bohl's death. See Minn.Stat. § 573.01; Webber, 97 F. at 145 (claim survives where breach of contract is primary cause for damages sought). Likewise her claim for tortious interference with contract also survived. See Thompson v. Estate of Petroff, 319 N.W.2d 400, 404-05 (Minn.1982) (stating wrongful interference probably survives because it resembles contract or property claim).
Furthermore, we conclude that the claim for unfair representation did not abate. This is an issue of first impression in Minnesota. The United States Supreme Court has stated that the "closest state-law analogy" for breach of the duty of fair representation is legal malpractice. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 167, 103 S.Ct. 2281, 2292, 76 L.Ed.2d 476 (1983). Minnesota has reached the question of whether a legal malpractice claim is an "injury to the person"; it is not. Johnson v. Taylor, 435 N.W.2d 127, 129 (Minn.App. 1989), review denied (Minn. Apr. 19, 1989). Thus, we conclude the unfair representation claim did not abate.
On the other hand, the assault claim and emotional distress claims are considered "injury to the person" claims. Cf. Thompson, 319 N.W.2d at 407 (holding prior statute that abated only intentional torts, but allowed personal injury claims based on negligence to survive unconstitutional); see also Dean v. Shirer, 547 F.2d 227, 229-30 (4th Cir.1976) (§ 1983 claim constituted injury to *630 person because under facts, act was similar to assault); Anspach v. Tomkins Indus., Inc., 817 F.Supp. 1499, 1508-10 (D.Kan.1993) (infliction of emotional distress is personal injury claim under Kansas abatement statute), aff'd sub nom. Anspach v. Sheet Metal Workers Int'l Ass'n, 51 F.3d 285 (10th Cir. 1995).
Minnesota has not addressed whether claims brought under the Minnesota Human Rights Act are "injury to the person" claims. In analyzing the Minnesota Human Rights Act, however, we often apply principles derived under Title VII. Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986). Other jurisdictions have held that Title VII actions are personal injury claims. See Slade v. United States Postal Serv., 952 F.2d 357, 360 (10th Cir.1991) (applying Oklahoma procedural law); Anspach, 817 F.Supp. at 1510 (applying Kansas statute). Likewise, we determine that Human Rights Act claims constitute "injury to the person." The assault, intentional and negligent infliction of emotional distress, and discrimination and reprisal claims abated unless there were special damages. See Minn.Stat. § 573.02, subd. 2. Special damages "are the natural but not the necessary consequence" of the complained of act. Smith v. Altier, 184 Minn. 299, 300, 238 N.W. 479, 479 (1931). "When items of special damage are claimed, they shall be specifically stated" in the pleading. Minn.R.Civ.P. 9.07. Bohl did not pray for any special damages. We conclude, therefore, that these claims did not survive her death.
2. Lipka argues that the district court erred in granting summary judgment on the unfair representation claim because she had three grievances with ISD No. 31 that were not pursued by the union. The alleged grievances were (1) harassment and a threat of violence that impaired safety in the workplace; (2) ISD No. 31's response when she complained, including her transfer; and (3) Bohl's reduction of hours.
A union has a duty to represent its members fairly. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); Eisen v. State, 352 N.W.2d 731, 735 (Minn.1984). This judicially-created duty is derived from a union's statutory right to be the exclusive bargaining representative of all employees in a bargaining unit. Eisen, 352 N.W.2d at 735. As the exclusive representative, a union must represent all employees fairly during collective bargaining and in the enforcement of the resulting collective bargaining agreement. Vaca, 386 U.S. at 177, 87 S.Ct. at 909-10. Thus, a union breaches the duty only if it treats members unfairly with regard to bargaining and enforcing conditions of employment. Tchida v. Police Officers' Fed'n, 375 N.W.2d 856, 859 (Minn. App.1985), review denied (Minn. Dec. 30, 1985); see also International Bhd. of Teamsters, Local No. 310 v. National Labor Relations Bd., 587 F.2d 1176, 1183 (D.C.Cir.1978). The duty does not apply to matters where the union does not act as the exclusive representative. Tchida, 375 N.W.2d at 858-59.
Here, the collective bargaining agreement provides that the transportation coordinator may reduce a driver's hours within the time spread of the pay level or as mutually agreed by the employer and employee. The time spread for Bohl's pay level was six to six and one-half hours. Bohl's hours were temporarily decreased from eight to six hours, well within the time spread. Bohl's hours were then increased to seven and one-half hours. Thus, there was no collective bargaining agreement infraction for the union to enforce.
Next, the collective bargaining agreement is silent on transfers. As a result, the union could not unfairly bargain or unfairly enforce this issue. Moreover, a decision to transfer employees is a managerial function not subject to union negotiation. Minneapolis Fed. of Teachers, Local 59 v. Minneapolis Special Sch. Dist. No. 1, 258 N.W.2d 802, 806 (Minn.1977).
Finally, the collective bargaining agreement does not contain a provision on harassment and violence in the workplace. The agreement's definition of "terms and conditions of employment," however, includes "the employer's personnel policy affecting the working conditions of the employees." Bemidji area school's personnel policy contains *631 a general statement of policy and reporting procedures concerning harassment and violence. Under the Minnesota Public Employment Labor Relations Act (PERLA), however, only terms and conditions of employment must be bargained. Minn.Stat. § 179A.07, subd. 2(a) (1994); see also University Educ. Ass'n v. Regents of the Univ. of Minn., 353 N.W.2d 534, 538 (Minn.1984) (decided under PELRA before its recodification in 1984). Matters of inherent managerial policy are not. Minn.Stat. § 179A.07, subd. 1 (1994); see also University Educ., 353 N.W.2d at 539. Even if a matter of inherent managerial policy affects employees terms and conditions of employment, the matter is not subject to mandatory arbitration if the policy and its implementation are inextricably intertwined. University Educ., 353 N.W.2d at 539.
Here, the policy statement was not subject to mandatory bargaining. It simply stated that harassment and violence in the workplace are not allowed because they violate state and federal laws and regulations. The union was not the exclusive representative in this area as it could not bargain around the laws. We need not reach whether the reporting procedures were subject to bargaining. Bohl did not follow these procedures, and therefore the union could not have required ISD No. 31 to adhere to the procedures.
3. Next, Lipka contends that the unions' constitutions and bylaws were enforceable contracts and that MSEA and MSEA Bemidji breached these contracts by failing to investigate Bohl's claims and prepare a confidential report.
Union constitutions are enforceable contracts between labor organizations. United Ass'n of Journeymen v. Local 334, 452 U.S. 615, 627, 101 S.Ct. 2546, 2553, 69 L.Ed.2d 280 (1981). The United States Supreme Court stated that
union constitutions are an important form of contract between labor organizations. Members * * * are often the beneficiaries of such interunion contracts, and when they are, they * * * may bring suit.
Wooddell v. International Bhd. of Elec. Workers, Local 71, 502 U.S. 93, 101, 112 S.Ct. 494, 500, 116 L.Ed.2d 419 (1991).
Under the MSEA constitution, the chapter president had the duty to review a charge of conduct detrimental to the association and to forward the charge to the executive director who would have the charge investigated to see if disciplinary proceedings were warranted. Also, a confidential report had to be prepared for the board of directors. Here, there is evidence that the union only investigated whether ISD No. 31 violated the collective bargaining agreement. There was no evidence that the union investigated whether Stevens was responsible for conduct detrimental to the association. A plaintiff, however, is barred from recovering under a contract theory absent an injury from the claimed breach. Lovell v. One Bancorp, 818 F.Supp. 412, 425 (D.Me.1993). Here, Bohl only alleged monetary damages. The union constitution provided that the wrongdoer could be penalized or lose his or her membership; there was no provision for monetary damages for the victim. Thus, we conclude that Bohl's claim failed because she did not assert damages that could be recovered because of the alleged breach.
4. Lipka also argues that MSEA, MSEA Bemidji, and Stevens tortiously interfered and conspired to tortiously interfere with Bohl's rights under the constitutions and bylaws.
The elements of tortious interference with a contract are (1) existence of a contract; (2) the wrongdoer must have knowledge of the contract; (3) the wrongdoer must intentionally procure the breach; (4) there must be no justification; and (5) there must be resulting damages. Royal Realty Co. v. Levin, 244 Minn. 288, 292, 69 N.W.2d 667, 671 (1955); Ludowese v. Redmann, 479 N.W.2d 59, 63 (Minn.App.1991), review denied (Minn. Feb. 10, 1992). Parties to a contract cannot be held liable for tortious interference. Nordling v. Northern States Power Co., 478 N.W.2d 498, 505 (Minn.1991). Thus, the unions could not be liable under this theory. Stevens could be potentially liable. As stated above, however, there are no resulting damages and the claim must fail.
*632 Conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. American Computer Trust Leasing v. Jack Farrell Implement Co., 763 F.Supp. 1473, 1489 (D.Minn.1991) (applying Minnesota law), aff'd sub nom. American Computer Trust Leasing v. Boerboom Int'l, 967 F.2d 1208 (8th Cir. 1992), and cert. denied, ___ U.S. ___, 113 S.Ct. 414, 121 L.Ed.2d 338 (1992). Here, only Stevens could be potentially involved. There was no combination of persons. Moreover, if the underlying claim fails, the conspiracy claim likewise fails. Id. Thus, Bohl's conspiracy claim must fail.
5. Lipka contends that MSEA, MSEA Bemidji, and Stevens tortiously interfered and conspired to tortiously interfere with Bohl's contract with ISD No. 31.
Lipka fails to meet the first element of the tortious interference test because there is no evidence in the record of a contract between Bohl and ISD No. 31. See Royal, 244 Minn. at 292, 69 N.W.2d at 671 (plaintiff must prove existence of contract).
6. Finally, by notice of review, MSEA, MSEA Bemidji, and Stevens argue that the tapes of phone conversations and transcripts thereof were inadmissible hearsay. This issue was not decided below and should not be addressed on appeal. Krueger v. State Farm Fire & Casualty, 510 N.W.2d 204, 209 (Minn. App.1993) (court's scope of review limited to issues decided by trial court). In any event, the district court may be affirmed without considering this evidence.

DECISION
Summary judgment was proper. The assault, emotional distress, discrimination, and reprisal claims abated because special damages were not pleaded or proved. Moreover, there were no genuine issues of material fact and the court correctly applied the law on the breach of contract, unfair representation, tortious interference, and conspiracy to tortiously interfere claims.
Affirmed.
NOTES
[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.